UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

McMAHAN SECURITIES CO. L.P,

        Plaintiff,

-vs-                                          Case No. 8:04-cv-1791-T-24TGW

FB FOODS, INC., f/k/a
Funny Bagel Food Company, Inc.,

        Defendant.
_____/

## **O R D E R**

This cause comes before the Court on McMahan Securities Co., L.P.'s ("MSC") motion for summary judgment (Doc. No. 234). Defendant FB Foods, Inc., f/k/a Funny Bagel Food Company, Inc. ("FBF") filed a response in opposition thereto (Doc. No. 261).

**I.    Factual Background**[1]

MSC is a Delaware limited partnership with its principal place of business in Greenwich, Connecticut (Doc. Nos. 169, ¶3). FBF is a Florida corporation with its principal place of business in Miami, Florida (Doc. No. 175, ¶4[2]). William Salgado ("W. Salgado") is the Executive Vice-President of FBF and an attorney admitted to practice in the state of Florida

---

[1] The Court will not state the entire procedural background of this case here. Instead, this Court incorporates by reference the background and procedural history as outlined in this Court's Order on Defendants', William Salgado and Alexander Salgado (collectively "the Salgados"), motion to dismiss MSC's amended complaint (Doc. No. 283).

[2] FBF's amended counterclaim.

1

(Doc. No. 287, ¶13). Alexander Salgado ("A. Salgado") is the President and Chief Executive Officer of FBF (Doc. No. 286, ¶14).

In 2001, FBF began marketing and distributing pre-packaged meals for children called "Funny Meals" (Doc. Nos. 175, ¶8[3] and Doc. No. 234, A. Salgado Depo., p. 61). After a couple of years, FBF sought to launch a new product line for adults (the "Adult Brand")(Doc. No. 175, ¶9[4]). In August 2003, FBF commenced negotiations with Weight Watchers International, Inc. ("WWI") to secure licensing rights for use of WWI's brand name in connection with FBF's proposed Adult Brand (Doc. Nos. 234, W. Salgado Depo., p. 17, and 289, ¶¶9-10).

In September 2003, FBF was introduced to MSC. FBF alleges that MSC "flaunted its claimed experience with similarly situated companies and assured FBF that, if retained, MSC would secure the needed capital on an expedited basis" (Doc. No. 175, ¶11[5]). On October 9, 2003, Michael Shillan, MSC's then Managing Director of Investment Banking, emailed to FBF a draft engagement agreement (Doc. Nos. 169, ¶17 and 175, ¶17). On or about November 7, 2003, MSC and FBF entered into an agreement whereby "MSC agreed to act as FBF's exclusive finder of financing for FBF's proposed new product line" (the "Agreement")(Doc. No. 261). The Agreement states in relevant part:

> The purpose of this letter is to confirm the engagement of [MSC] with [FBF] to act exclusively for [FBF] for the Engagement Period (as hereinafter defined) for the purposes of introducing to [FBF] certain individuals or institutions known to MSC, or otherwise to be identified by it, who may be interested in investing in, or arranging for others to invest in, [FBF]'s equity securities or securities convertible or exercisable into or exchangeable for equity securities (collectively

---

[3] FBF's amended counterclaim.

[4] FBF's amended counterclaim.

[5] FBF's amended counterclaim.

> "securities") with respect to an aggregate investment of approximately $10,000,000 -$30,000,000 (the "Financing").
>
> MSC is being engaged pursuant to this agreement to act only as a finder and facilitator with respect to the Financing by providing the services described below. In the event that [FBF] determines to engage MSC to act as placement agent and financial advisor with respect to the Financing, and MSC determines to accept such engagement, the obligations of the parties with respect to such services shall only be created by and shall be reflected in a definitive Placement Agency Agreement to be executed by the parties.

(Doc. No. 175, Exh. A). The Agreement sets out the following services that MSC would provide to FBF:

> MSC shall provide [FBF] with the following services during the Engagement Period: (i) identify and make contact with prospective financing sources in the manner and at the times to be determined by MSC in its sole discretion; (ii) assist [FBF] in conducting presentations and due diligence meetings with prospective financing sources; and (iii) provide such other facilitation services as the parties may from time to time agree to. MSC shall have no obligation to undertake any other activity on behalf of [FBF] or otherwise to provide any service to or on behalf of [FBF] without its express written consent.

(Doc. No. 175, Exh A., ¶1).

In the Agreement, FBF agrees that MSC will be working on behalf of other clients and that financing sources contacted by MSC may not invest in FBF's securities. FBF further acknowledges that MSC is not obligated to invest capital in any securities of FBF and that MSC is not an agent or representative of FBF with respect to negotiating or closing any part of the Financing. Specifically, the Agreement states:

> [FBF] understands and agrees that during the Engagement Period MSC may contact financing sources on behalf of other clients and that some or all of such financing sources may not be contacted by MSC in connection with the Financing and that as a result during the Engagement Period financing sources contacted by MSC may invest in other client's securities rather than securities of FBF . . . [FBF] acknowledges that nothing herein shall be construed to create any obligation on the part of MSC or any of its affiliates to invest its or their capital or any funds under their direction or control in any securities of [FBF]. [FBF] also acknowledges

3

>   that MSC is not an agent or representative of [FBF] with respect to negotiating or closing any part of the Financing and that any obligation with respect to investing in [FBF]'s securities shall only be created by a definitive agreement between [FBF] and a financing source.

(Doc. No. 175, Exh. A, ¶1).

The Agreement contains the following language regarding conditions to MSC's services:

>   MSC's engagement to provide services hereunder is subject to the satisfaction, in its sole discretion, of the following conditions from time to time during the Engagement Period:
>
>   (a)   MSC's ongoing due diligence investigation of [FBF] , including [FBF]'s financial condition and financial statements, business prospects, management, board of directors, advisory board, etc;
>
>   (b)   No material adverse change in the business, financial condition or business prospects of [FBF] or in the industry in which it participates;
>
>   (c)   No material adverse change in general investment market conditions.

(Doc. No. 175, Exh. A, ¶5). Prior to its execution, the Agreement was modified to mandate that all actions under the Agreement be brought in Florida instead of Connecticut (Doc. No. 78, Salgado Aff., ¶11).[6] Furthermore, the termination provision of the Agreement was revised to require thirty day prior written notice. The Agreement contains the following language regarding termination:

>   The period of time from the date of this letter through the date of termination

---

[6]Paragraph 8 of the Agreement provides in relevant part, "[t]he parties agree that any disputes arising out of, in connection with or with respect to this agreement shall be adjudicated in a state or federal court of competent civil jurisdiction sitting in the State of Florida and nowhere else. Each of the parties hereto irrevocably submits to the jurisdiction of any such court for the purposes of any suit, civil action or other proceeding arising out of, in connection with or with respect to this agreement. To the extent permitted by applicable law, each of the parties hereto hereby waives and agrees not to assert by way of motion, as a defense or otherwise in any such suit, any claim that is not subject to the jurisdiction of the above courts, that such suit is brought in an inconvenient forum, that the venue of such suit is improper or that it is entitled to a trial by jury."

as provided for below is referred to as the "Engagement Period." This agreement may be terminated as follows:

(a)  Should MSC not introduce [FBF] to financing sources that invest at least $10,000,000 of gross proceeds in connection with the Financing by close of business on January 9, 2004 then [FBF] shall have the right to terminate the engagement of MSC at the close of business on such date and all obligations of [FBF] to MSC hereunder, except as described in Sections 2, 3, 4(b) and 6 and this Section 7, will terminate.

(b)  Thereafter, either party may terminate this agreement upon thirty days prior written notice without liability or continuing obligation to the other except for the obligations under Sections 2, 3, 4(b) and 6 and this Section 7 which shall survive and continue.

(Doc. No. 175, Exh. A, ¶7). The Agreement contains a merger clause that the Agreement supercedes all prior understandings and language prohibiting amendments "except in writing signed by all parties hereto" (Doc. No. 175, Exh. A, ¶13). Pursuant to paragraph 3(a) of the Agreement, FBF paid MSC a $50,000 retainer fee (Doc. No. 175, ¶16[7]).

Simultaneous with MSC and FBF entering into the Agreement, MSC contacted potential investors on behalf of FBF (Doc. No. 234, Appel Aff., ¶¶4 and 6 and Exh. 11). In late November 2003, FBF received an aggregate of $1.75 million in bridge loan financing from three entities (hereinafter "Bridge Financing") including Vertitas-Scalable Investment Products Fund, LLC. (Doc. No. 263, W. Salgado Depo., p.696). FBF paid MSC fees in excess of $200,000.00 for arranging the Bridge Financing (Doc. No. 234, Appel Aff., ¶5). The parties dispute whether the Bridge Financing was part of the Financing contemplated under the Agreement (Doc. Nos. 234 and 262).

In December 2003, MSC and FBF prepared a business plan which included information

---

[7]FBF's amended counterclaim.

regarding FBF, the proposed Adult Brand, and WWI's involvement with FBF (Doc. No. 234, Exh. 13). On or about December 12, 2003, FBF advised MSC to stop soliciting investors due to WWI objecting to the use of WWI's name in FBF's business plan (Doc. Nos. 234, W. Salgado Depo., pp. 80-82 and Appel Aff., ¶9). Also in December 2003, MSC "voiced concern that no agreement with WWI had been executed and raised the possibility that such delay might be for the purpose of [Invus][8] acquiring FBF at a low price" (Doc. No. 289, ¶24) or somehow trying to steal the deal. FBF contends that MSC and D. Bruce McMahan[9] "assured that would not happen to FBF" (Doc. No. 263, A. Salgado Depo., pp. 318-319) and A. Salgado understood this to mean that FBF had a financial commitment from MSC including, if necessary, putting up the money to launch the Adult Product (Doc. No. 262).

MSC sought to "amend the Agreement to (1) extend the exclusive relationship between MSC and FBF an additional six months and (2) provide for the immediate applicability of the M & A provision" (Doc. Nos. 262 and 263, Exh. 15). On January 7, 2004, the Agreement was amended (the "Amendment")(Doc. Nos. 175, Exh. B and 261). The Amendment contained the following clause:

> To the extent not modified or amended herein, all terms, provisions and conditions of the Engagement Agreement shall remain in full force and effect.

(Doc. No. 175, Exh. B, ¶4). The Amendment did not include any language with respect to MSC providing funding to FBF.

---

[8]Invus Limited ("Invus"), a private equity firm and shareholder of WWI (Doc. No. 175, Exh. B).

[9]D. Bruce McMahan is not a named party in the instant action (Doc. No. 230). D. Bruce McMahan is MSC's Chief Executive Officer (Doc. No. 234, McMahan Aff., ¶1).

6

In January 2004 MSC began contacting companies other than WWI which might be willing to license their brand names for use with the Adult Brand (Doc. Nos. 234, Appel Aff., ¶10 and 289, ¶26). On February 1, 2004, senior FBF officers met with D. Bruce McMahan and Michael Shillan (Doc. No. 289, ¶27). FBF contends that at that meeting D. Bruce McMahan reiterated that MSC would support FBF even in the event a licensing agreement was not consummated (Doc. No. 175, ¶27[10]). On February 3, 2004, WWI orally advised FBF that it was "not amenable to licensing its brand name" (Doc. Nos. 175, ¶28[11] and 263, W. Salgado Depo., pp. 98-99).

On or about March 10, 2004, FBF moved forward with the launch of the Adult Brand, including the creation of a new offering memorandum which contemplated a private-labeled Adult Brand instead of the utilization of a licensed established name brand (the "Private Label Book")(Doc. Nos. 175, ¶¶31-36[12], 234, Appel Aff., ¶12 and Exh. 22). FBF alleges that in March 2004, MSC notified FBF that MSC's hedge fund had committed $10,000,000 to $15,000,000 to FBF and that FBF would receive the funds within ten days of the publication of the Private Label Book (Doc. No. 175, ¶33[13]). However, Michael Shillan testified that he had no recollection of making this representation (Doc. No. 263, Shillan Depo., pp.53-56).

In late April 2004 the Private Label Book was completed (Doc. No. 234, W. Salgado Depo., p.84). After the Private Label Book was completed, MSC proceeded to once again seek

---

[10]FBF's amended counterclaim.

[11]FBF's amended counterclaim.

[12]FBF's amended counterclaim.

[13]FBF's amended counterclaim.

prospective investors for FBF (Doc. Nos. 234, Appel Aff., ¶¶13-18, 263, Shillan Depo., p. 104 and 289, ¶34). Between June 22-24, 2004, FBF met with three prospective investors (Doc. No. 263, W. Salgado Depo., pp.457-458).[14] MSC contends that in June 2004 FBF began having critical financial problems and that FBF threatened MSC with litigation (Doc. No. 234).

On or about June 29, 2004, MSC's personnel met with FBF's personnel to review certain financial documents at FBF's offices (Doc. No. 289, ¶56). On June 30, 2004, MSC sent an e-mail to FBF regarding a funding proposal to meet FBF current cash needs (Doc. No. 263, Exh. 20). However, on July 2, 2004, Jay Glassman, MSC's Chairman of the Executive Committee, notified FBF in writing of MSC's intent to terminate the Agreement (Doc. No. 234, Exh. 37).

**II.     Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986). A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the Court that there is an absence of evidence to support the non-moving party's case. Id. at 325. Rule 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. See id. When a moving party has discharged its burden, the non-moving party must

---

[14] Mercantile Capital, Amaranth, and the Shansby Group (Doc. Nos. 263, W. Salgado Depo., pp. 461-463 and Exh. 19).

then "go beyond the pleadings," and by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial. Id. at 324.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Samples on behalf of Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). The Eleventh Circuit has explained the reasonableness standard:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." [citation omitted]. The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. See Augusta Iron & Steel Works v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

### III.    Discussion

MSC seeks a summary judgment order dismissing FBF's amended counterclaim and associated affirmative defenses. FBF contends that there are substantive disputes of material fact which preclude entry of summary judgment and that MSC's motion for summary judgment is not supported by the record.

#### A.    Anticipatory Repudiation (Count I and First Affirmative Defense)

On July 2, 2004, Jay Glassman, MSC's Chairman of the Executive Committee, notified FBF in writing of MSC's intent to terminate the Agreement. The July 2, 2004, letter states in relevant part:

> McMahan Securities has assumed that [FBF] wishes to terminate the Agreement or has materially breached the Agreement by no longer cooperating with McMahan Securities in its efforts thereunder. Consequently, McMahan Securities hereby gives [FBF] written notice that the Agreement shall terminate 10 days from the date hereof.

(Doc. No. 234, Exh. 37). FBF contends that "MSC anticipatorily repudiated the Agreement by failing to provide the requisite notice of termination as set forth in the unambiguous terms of the Agreement" (Doc. No. 261, p. 5). Specifically, MSC only gave FBF ten days notice regarding termination of the Agreement instead of the thirty days notice required under the Agreement.[15]

In Count IV of its amended complaint, MSC seeks reformation of the Agreement to provide that either party might terminate the Agreement upon ten days notice (Doc. No. 169, ¶¶66 -72). Neither FBF or MSC moved for summary judgment on any of the claims (Counts I -

---

[15]That is, the termination should have been effective August 1, 2004 rather than July 12, 2004 (Doc. No. 234, W. Salgado Depo., p.131).

10

VI) in MSC's amended complaint (Doc. No. 169) or MSC's eighteen affirmative defenses (Doc. No. 289). FBF's claim for anticipatory repudiation (Count I) and first affirmative defense are inextricably intertwined with MSC's claim for reformation. Furthermore, the Court finds that there are genuine issues of material fact with respect to MSC's purported reasons for its termination of the Agreement. Consequently, the Court will deny MSC's motion of summary judgment as to Count I of FBF's amended counterclaim and FBF's first affirmative defense.

      **B.**      **Breach of Contract (Count II and Second, Fourth and Sixth Affirmative Defenses[16])**

"Under Florida law, the elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages." Bland v. Freightliner, L.L.C., 206 F. Supp.2d 1202, 1210 (M.D. Fla. 2002); see also Beck v. Lazard Freres & Co., LLC, 175 F.3d 913,914 (11th Cir. 1999). The existence of a contract between MSC and FBF does not appear to be in dispute. What is very much in dispute, and one of the central issues in this case, is what the terms of the Agreement and Amendment cover and whether MSC's conduct constitutes a material breach. Despite FBF's contentions that subsequent to the Agreement MSC expanded its involvement with FBF, and that MSC made certain representations to FBF and third parties regarding funding, the Court is limited to examining the express terms of the Agreement and Amendment in light of MSC's conduct.

FBF contends that MSC breached the parties' Agreement by committing the following acts: (1) "continually misrepresenting to FBF that it had commitments from certain private

---

[16]The Court notes that FBF's third affirmative defense was striken as redundant (Doc. No. 284) and MSC's motion for summary judgment fails to specifically address FBF's fifth affirmative defense of unclean hands.

investors who were ready, willing and able to inject substantial capital into FBF" and failing to deliver the funds; (2) providing FBF only ten days written notice of its intent to terminate the Agreement and failing to perform its obligations under the Agreement for the requisite thirty days; and (3) failing to "inject into FBF funds through either closings it represented were imminent or its own promised capital injections" (Doc. No. 261). MSC argues that FBF seeks to impermissibly "transmogrify" MSC from a finder of financing into either a guarantor of such financing from third-parties or the funding source (Doc. No. 234).

### 1. **Commitments From Certain Private Investors/Failure to Inject Funds**

FBF admits that "both the Agreement and Amendment are silent as to MSC's obligation to inject its own funds or an aggregate amount of investor funds into FBF." However, FBF contends that "MSC and its principals undertook an affirmative obligation to provide funds to FBF by conducting closings it represented were imminent or through its own promised capital injections" (Doc. No. 261, pp. 8, 10 -11 and 13). Based upon this Court's review of FBF's statement of disputed facts (Doc. No. 262, pp. 9-10), tacit in FBF's argument is the notion that the terms of the Agreement are inconsistent with MSC's subsequent conduct. Additionally, it appears to this Court that D. Bruce McMahan did make oral representations regarding MSC "being there" for FBF or otherwise providing financial resources (Doc. No. 263, Gellert Depo., pp. 28, 68, 70 and 79 and Young Aff., ¶10). These representations were apparently initially made contemporaneously with the negotiation and signing of the Agreement and Amendment (Doc. No. 263, Shillan Depo., pp. 100-101 and Segal Aff., ¶¶7-8). However, since the written terms of the Agreement and Amendment specifically address MSC's duties, they must control this Court's analysis of FBF's claim of breach of contract.

The Court need look no further that the plan language of the Agreement and Amendment to grant summary judgment in favor of MSC on FBF's contention that MSC breached their Agreement by "failing to provide funds to FBF by conducting closings it represented were imminent or through its own promised capital injections." It is well settled that "'when the terms of a voluntary contract are clear and unambiguous . . . the parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties.'" Ernie Haire Ford, Inc. v. Ford Motor Co., 260 F.3d 1285, 1290 (11th Cir. 2001)(citations omitted). Furthermore, where a contract is silent as to a particular matter, a court may not impose contractual rights and duties not contained in the contract. See Gulf Cities Gas Corp. v. Tangelo Park Service Co., 253 So.2d 744, 748 (Fla. 4th DCA 1971).

The clear and unambiguous language of the Agreement and Amendment preclude a finding that MSC was required to finalize closings. Furthermore, in his deposition, Michael Shillan testified that while MSC might assist in the negotiation process between FBF and a potential investor, the ultimate financing agreement arrived at would be between FBF and the investor (Doc. No. 263, Shillan Depo., pp. 106-108). With respect to MSC's purported assurances that it would support FBF financially, including ultimately funding the launch of the Adult Product if necessary, the Court finds that this duty is not required by the language of the Agreement or Amendment despite the fact that D. Bruce McMahan purportedly initially made this promise prior to, or contemporaneous with, the execution of these documents. In fact, FBF concedes that the parties never discussed "what form MSC's infusion of cash would take" (Doc. No. 261). Since the Agreement requires that all amendments be in writing, any oral representations subsequent to the Agreement and Amendment cannot vary their terms.

2.      **Insufficient Notice**

The Agreement and Amendment contain specific language regarding termination (Doc. No. 175, Exh. A, ¶7 and Exh. B, ¶4). Specifically, the Agreement contains the following language regarding termination of the Agreement:

> (b) Thereafter[17], either party may terminate this agreement upon thirty days prior written notice without liability or continuing obligation to the other except for the obligations under Sections 2, 3, 4(b) and 6 and this Section 7 which shall survive and continue.

(Doc. No. 175, Exh. A, ¶7(b)).

FBF's claim for breach of contract and related affirmative defenses based upon MSC's alleged premature termination of the Agreement are inextricably intertwined with MSC's claim for reformation. Furthermore, the Court finds that there are genuine issues of material fact with respect to MSC's purported reasons for its termination of the Agreement. Lastly, there are genuine issues of material fact as to whether MSC's alleged premature termination of the Agreement is a material breach of the Agreement.

Accordingly, MSC's motion for summary judgment on Count II of FBF's amended counterclaim and related affirmative defenses is **GRANTED** to the extent that under the Agreement and Amendment MSC is not required to provide funds to FBF by conducting closings it represented were imminent or through its own promised capital injections. Otherwise the motion is **DENIED** as to Count II of FBF's amended counterclaim and related affirmative defenses.

---

[17]After the "Engagement Period" or "Engagement Date" as defined in the Agreement and Amendment.

C.   **Unjust Enrichment (Count III)**

On June 29, 2006, subsequent to the briefing on MSC's motion for summary judgment but prior to this Court taking MSC's motion for summary judgment under advisement, this Court dismissed FBF's claim for unjust enrichment (Count III) with prejudice (Doc. No. 284). Therefore, MSC's motion for summary judgment on Count III of FBF's amended counterclaim is **DENIED AS MOOT**.

D.   **Fraud in the Inducement (Count IV)**

The elements of a claim for fraudulent inducement are: (1) a false statement concerning a material fact; (2) the defendant's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reasonable reliance on the representation.  See Johnson Enters. of Jacksonville, Inc. V. FPL Group, Inc., 162 F.3d 1290, 1315 (11th Cir. 1998); see also Flamenbaum v. Orient Lines, Inc., 2004 WL 1773207, *5, fn. 4 (S.D. Fla. 2004)(citing Hillcrest Pacific Corp. v Yamamura, 727 So. 2d 1053, 1055 (Fla. 4th DCA 1999)).  The requirements of "false statements" include material misrepresentations or omissions of fact.  See Bradley Factor v. United States, 86 F. Supp. 2d 1140, 1146 (M.D. Fla. 2000).

As an initial matter, MSC argues that FBF's fraud claims (in Counts IV-VI) should be limited to the following three misrepresentations: (1) "MSC aggressively represented and flaunted its claimed experience with similar situated companies"; (2) MSC "assured FBF that, if retained, MSC would secure the needed capital on an expedited basis"; and (3) "MSC [assured] FBF that it could also secure bridge financing for FBF's benefit" and that "the Parties agreed that MSC would arrange for bridge financing of approximately $1.25 million" (Doc. No. 235).

Specifically, MSC argues that no other misrepresentations, including the majority of those contained in FBF's interrogatory responses (Doc. No. 234, Exh. 40) were pled or alleged to be false. FBF counters that its interrogatory responses merely provide details with respect to MSC's alleged misrepresentations and "add nothing new" (Doc. No. 261) and that it "has pled and can prove a myriad of false representations." MSC cites no binding Eleventh Circuit precedent for its proposition that this Court should not consider the details regarding MSC's alleged misrepresentation contained in FBF's interrogatory responses and, as such, this Court finds MSC's argument unavailing. However, as discussed below, the Court has previously dismissed FBF's claims for fraud as to those alleged misrepresentations which occurred subsequent to the execution of the Agreement.

Florida law supports an action for fraud in the inducement premised upon false representations regarding a defendant's experience, qualifications, and/or expertise in a particular area when, as here, those claims concern a past or existing fact. See Eastern Cement v. Halliburton Co, 600 So. 2d 469, 471 (Fla. 4th DCA 1992). In reviewing the motion for summary judgment, MSC has not met its burden of establishing that there are no genuine issues of material fact regarding the alleged representations it purportedly made to FBF pre-Agreement regarding MSC's experience, know-how, contacts, and ability to expeditiously raise capital and whether those misrepresentations induced FBF to enter into the Agreement. In fact, the circumstances surrounding the parties entering into the Agreement are very much in issue.

In this Court's Order on MSC's motion to dismiss FBF's six affirmative defenses and amended counterclaim (Doc. No. 284), the Court addressed MSC's arguments that the parol evidence rule and merger doctrine preclude FBF from making its fraudulent inducement claim

16

and that the economic loss rule bars FBF's claim for fraudulent inducement. The Court dismissed FBF's claim for fraudulent inducement as to those alleged misrepresentations which occurred subsequent to the execution of the Agreement because those inducements are barred by the economic loss rule. As such, the Court will not address the parties arguments again here.

### E. Fraudulent Misrepresentation (Count V) and Negligent Misrepresentation (Count VI)

The elements of a claim for fraudulent misrepresentation are: "(1) a misrepresentation of a material fact; (2) which the person making the misrepresentation knew to be false; (3) that the misrepresentation was made with the purpose of inducing another person to rely upon it; (4) that the person relied on the misrepresentation to his detriment; and (5) that this reliance caused damages." Romo v. Amedex Ins. Co., 930 So.2d 643, 651 (Fla. 3rd DCA 2006)(citations omitted)); see also Citibank v. Data Lease Financial Corp., 828 F.2d 686, 694 (11th Cir. 1987). The elements of a claim for negligent misrepresentation are: "the defendant made a misrepresentation of material fact that he believed to be true but was in fact false; (2) the defendant was negligent in making the statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely . . . on the misrepresentation; and (4) injury resulted to the plaintiff acting in justifiable reliance upon the misrepresenation." Id. at *7 (citations omitted).

FBF's claims for fraudulent misrepresentation and negligent misrepresentation are largely based on the same the allegations supporting FBF's claim for fraud in the inducement. Likewise, MSC reiterates the arguments it made in support of its motion for summary judgment on FBF's claim for fraud in the inducement. This Court previously dismissed Counts V and VI of the amended counterclaim with respect to alleged misrepresentations that occurred after the

execution of the Agreement finding they are barred by the economic loss rule. Otherwise, the Court finds that MSC has not met its burden of establishing that there are no genuine issues of material fact regarding the alleged representations it purportedly made to FBF pre-Agreement regarding MSC's experience, know-how, contacts, and ability to expeditiously raise capital.

### F.    Constructive Fraud (Count VII)

On June 29, 2006, subsequent to the briefing on MSC's motion for summary judgment but prior to this Court taking MSC's motion for summary judgment under advisement, this Court dismissed FBF's claim for constructive fraud (Count VII) with prejudice (Doc. No. 284). Therefore, MSC's motion for summary judgment on Count VII of FBF's amended counterclaim is **DENIED AS MOOT**.

### IV.    Conclusion

After reviewing MSC's motion for summary judgment, FBF's response, and all supporting documents, the Court finds that there remain certain genuine issues of material fact that should be submitted to a jury and not summarily judged by this Court.

Upon consideration, it is **ORDERED AND ADJUDGED** that:

(1)    MSC's motion for summary judgment (Doc. No. 234) is **DENIED** as to Count I of FBF's amended counterclaim and FBF's first affirmative defense.

(2)    MSC's motion for summary judgment (Doc. No. 234) is **GRANTED** as to Count II of FBF's amended counterclaim and second, fourth and six affirmative defenses to the extent that MSC is not required under the Agreement and Amendment to provide funds to FBF by conducting closings it represented were imminent or through its own promised capital injections. Otherwise the motion is **DENIED** as

to Count II of FBF's amended counterclaim and second, fourth and six affirmative defenses.

(3) MSC's motion for summary judgment (Doc. No. 234) is **DENIED AS MOOT** as to Count III of FBF's amended counterclaim.

(4) MSC's motion for summary judgment (Doc. No. 234) is **DENIED** as to Counts IV-VI of FBF's amended counterclaim.

(5) MSC's motion for summary judgment (Doc. No. 234) is **DENIED AS MOOT** as to Count VII of FBF's amended counterclaim.

**DONE AND ORDERED** at Tampa, Florida, this 15th day of September, 2006.

*Susan C. Bucklew*
SUSAN C. BUCKLEW
United States District Judge

Copies to:

Counsel of Record